## Schmidt *against* the United Iusurance Company.

THIS was an action on a policy of insurance, dated the 5th *July*, 1803, on thirty-five bales of cotton, valued at 1,800 dollars, at and from *New-York* to *Hamburgh*, on board of the *American* ship *Orozimbo*. The cause was tried at the *New-York Sittings*, on the 27th day of *April*, 1805, before Mr. Justice *Thompson*. The policy contained the following clause: " And that in case of loss, the assured are to abate two per cent, and such loss to be paid in thirty days after proof thereof, but no partial loss, or particular average, shall in any case be paid, unless amounting to *five per cent*." It contained, also, the clause, authorising the assured, their factors, servants and assigns, to sue, labour, and travel for, and about the defence, and safeguard of the goods insured.

*Margin note:* If the port to which a vessel is destined, as described in a policy of insurance, be actually blockaded, the assured may abandon as for a total loss. The interdiction of commerce with the port of destination, by means of a blockade, is a peril within the policy; and the going to another port, afterwards, for the purpose of delivering the goods, was considered, after an abandonment, as done for the benefit of the insurer. The acceptance of the goods at another port by the *consignee*, under the circumstances of the case, and from necessity, is an act done for the benefit of all concerned, and does not prevent the assured from recovering for a total loss on the abandonment.

NEW-YORK, May, 1806.

Schmidt
v.
United Insur.
Company.

The material facts proved at the trial, were the following: On the arrival of the ship on soundings, in the *English Channel*, she was boarded by an officer of a *British* ship of war, the commander of which informed the master of the *Orozimbo*, that the *Elbe* was blockaded, and indorsed one of his papers, forbidding him to proceed thither. When off the *Isle of Wight*, she was again boarded by an officer of another *British* ship of war, who indorsed the *register*, and forbade the master of the *Orozimbo* from proceeding to *Hamburgh*, under the penalty of being made lawful prize; but strongly advised him to go into *Portsmouth*, and take the advice of the agent of the ship-owner, how to act for the benefit of the ship and property. The master of the *Orozimbo* accordingly went into *Spithead*, where he received a letter, dated the 29th *August*, 1802, from a Mr. *Wilson*, agent of the ship-owner, recommending to him, " to go to *Embden*, as the nearest neutral port to *Hamburgh*." The *Orozimbo* arrived in the *Road of Embden*, the 9th *September*, and the master gave immediate information of his arrival to the owner at *Hamburgh;* but did not receive orders to unload the cargo until the 23d of *September*. The cargo was regularly delivered in good order, at *Embden*. The bills of lading were there produced, and discharged by the agents of the consignees of the goods, and were forwarded to *Hamburgh* to the ship-broker there, who collected the freight. It appeared from a letter, dated at *Hamburgh*, the 13th *September*, 1803, written by the owner of the ship to the master, while at *Embden*, that he had great difficulty in persuading the consignees to receive the goods at the latter place, as they wished the ship to deliver them at *Lubeck;* that they had finally consented to receive them at *Embden*, and to pay all expenses in consequence of going there.

While at *Embden*, the ship received considerable damage in her hull, spars and rigging, from being run foul of by another vessel, in a severe gale of wind. There was also an account for charges and expenses in consequence of being obliged to go into *England*. A general average of these damages was settled at *Embden*. The evidence of the ave-

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

rage loss, however, had not been exhibited to the defendants, with the other preliminary proofs. The defendant moved for a nonsuit, which was overruled by the judge. The plaintiff then offered to prove, that it was generally understood at *New-York*, at the time the *Orozimbo* put into *Spithead*, that *Hamburgh* was blockaded. This evidence, though objected to, was admitted. A witness testified, that he had received a letter from his correspondent at *Hamburgh*, in the autumn of 1803, stating that *Hamburgh* was blockaded, which fact, the witness believed, was generally known at *New-York*. The plaintiff claimed a total loss, and also fifty-seven dollars and ninety cents, being the proportion of the average loss, settled and paid at *Embden*. The jury, under the direction of the judge, found a verdict for the plaintiff, on the first count on the policy, for a total loss, and on the count for money paid, laid out and expended, for the amount of the average loss. On the third count in the declaration, for money had and received, a verdict was entered for the defendants.

*Hoffman* was proceeding to open the argument on the part of the defendants, when *Radcliff* asked for the *points* on which he meant to insist. *Hoffman* said they had been delivered to the court, and that was sufficient.

*The court.* By the present practice, it is enough if the points are handed to the court when the cause is called. The leading counsel must state the points in the course of his argument, and it is not required that they should be delivered to the opposite counsel with the copy of the case. But, for the sake of convenience, the court now decide, that the rule of *practice in future* shall be, that the opening counsel, before he begins his argument, must deliver in writing to the opposite counsel, the points on which he means to insist.

*Hoffman.* On the part of the defendants, it will be contended, 1. That there was not sufficient evidence to show that *Hamburgh* was blockaded; but, admitting that fact, there was no loss within the terms of the policy. 2. Supposing that the insured were justifiable in not proceeding to *Hamburgh*, still the voyage was not thereby lost, as the

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

insured were bound to go to the nearest port of safety. 3. The acceptance of the cargo at *Embden*, by the *consignees*, precludes all claim for a total loss. 4. The evidence of a *partial loss* was inadmissible, and insufficient. 5. The verdict was against law and evidence.

If the plaintiff is entitled to recover in this case, it must be on some very strict rule of law, not from any principle of justice. The master of the *Orozimbo* states, that he was informed by the *British* cruisers, that the *Elbe* was blockaded ; but mere information of a blockade ought not to prevent the insured from proceeding to his port of destination, since before his arrival off the port, it is possible that the blockade, if existing, may be raised. No case is to be found, in which it has been decided, that the fact of being turned away from a blockaded port, is a loss or peril within the policy ; or that a mere apprehension of a blockade would justify the insured in leaving his course to the place of destination, and going to another port. But a late adjudication in the *English* courts, somewhat analogous to the present, is very strong in favour of the defendants, to show, that such an event is not a peril for which the insurers are responsible. It is the case of *Hadkinson* v. *Robinson*, 3 *Bos. & Puller*, *p.* 388. A vessel laden with fruit, sailed from *Lisbon*, under convoy, destined to *Naples ;* but on receiving intelligence that the ports of the king of *Naples* were shut against the *English*, they went into *Minorca*, where the cargo was sold. The court of common pleas gave judgment for the defendant, and intimated pretty strongly their opinion, that the shutting of a port against the vessel insured, was not a loss within the policy.

Admitting, however, that the master was justifiable, under existing circumstances, in not going to *Hamburgh*, still the voyage was not lost, as he might go to the nearest port ; for if necessity prevent the insured from reaching the place of destination, he may go to the nearest port he can reach in safety. But the acceptance of the cargo at *Embden*, by the consignees, is conclusive against the plaintiff, and he cannot claim a loss on the policy. If the consignee had re-

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

fused to receive the goods at *Embden*, they might have been sold for the benefit of all concerned, and the insured would have had some ground for a claim against the defendants. Here the agent of the insured, after full deliberation and reflection, received the cargo, and paid the freight. On what pretence, then, can the insured assert his demand ? As the plaintiff claimed for a total loss, the evidence of the partial loss at *Embden* was inadmissible. But if properly admitted, it was insufficient. If the insured meant to have proceeded for gross average, he ought to have exhibited this evidence among the preliminary proofs. The rules of settling averages at *Embden*, are different from those adopted here ; and the jury ought not to have been directed to take the former, as the measure of the damages.

*Radcliff & T. L. Ogden*, for the plaintiff. The turning away from a blockaded port by a belligerent, is comprehended under the description of the *restraints of princes*, and is clearly a peril within the policy. The language used in the policy is the most general and comprehensive that could be devised.* The restraint of neutral commerce by belligerents, in preventing their entrance into a blockaded port, is, as Sir *Wm. Scott* observes, " a high act of sovereignty."† The case of *Hadkinson* v. *Robinson*,§ which has been cited, is in favour of the plaintiff, for it is not pretended that a prohibition to enter the destined port, was not a peril within the policy. That case turned, however, upon the effect of the memorandum in the policy, as to perishable articles. The true question is, was there, in this case, a blockade ? The blockade is to be ascertained in two ways ; first, by the *simple fact* ; second, by a *notification* of the fact.

[KENT, C. J. This court have decided, that there must be evidence of a blockade in fact. A mere notification amounts to nothing.*]

There was legal evidence of a blockade in fact. Letters from *Hamburgh*, state the existence of the blockade. Two of the belligerent cruisers successively intercepted the *Orozimbo*, and notified the master of the blockade, and prohi-

* *Marshall*, 237, 434. *Park*, 24. *Molloy*, book 2, ch. 7, sec. 7.
† *The Henrick & Maria, Rob.* vol. 1, p. 148.
§ 3 *Bos. & Puller*, 388. See also *Dyson* v. *Rowcroft*, same book, p. 474.

* *Williams* v. *Smith*, 2 *Caines*, 11.

NEW-YORK, bited him from proceeding to that port. Suppose, however,
May, 1806. that the *Elbe* was not actually blockaded, was it not the duty

Schmidt
v.
United Insur.
Company.

of the master, knowing the rigorous principles on which *British* courts of admiralty proceed as to blockade, to have turned aside, after the information and inhibition he received? Ought he to have proceeded, afterwards, and exposed the property entrusted to his care to seizure and condemnation? His deviation was perfectly justifiable. In the language of Lord *Alvanley*,[†] the peril acted immediately on the subject insured. The master was forbidden by two cruisers from going to *Hamburgh*. It is, therefore, distinguishable from the case of *Hadkinson* v. *Robinson*. Here the ship proceeded until she was stopped, and forbidden to prosecute her voyage under the penalty of confiscation. The master was under the *restraint of an armed force;* and he acted with prudence and discretion in turning aside, to avoid exposing the property to confiscation. But, it is said, he ought to have proceeded farther, and had he been captured and condemned, then there would have been a clear loss within the policy. But should we not, then, have been told of the *violation of a blockade?*[§] Again, it is said, that the assured ought have gone to *Embden*, or the nearest port. It is sufficient, when under the pressure of necessity, if the master act with due discretion, and for the interest of all parties. He was strongly advised to go to *Portsmouth* for directions, and that, or *London* was the nearest port. In fact, he went to *Embden*, as clearly the best port for all concerned. The insurance was to a particular port or market. The insured was prevented by a superior power from reaching that port, and from delivering the goods there. He is forced into a different port, in the territory of a different sovereign, governed by different laws; he has lost the market, and all the expected benefits of the voyage. The voyage is thus *defeated and lost*, and the plaintiff had a right to abandon. The right to abandon in case of *embargo* is not doubted.[*] The peril in this case is equally a just cause of abandonment; and the loss has continued total; for the blockade continued, and it does not ap-

† *Hadkinson* v. *Robinson*, 3 Bos. & Puller, 392.

§ *Vos & Graves* v. *United Insur. Company*, *Caine's Cases in Error*, p. 8.

* *Goss* v. *Withers*, 2 Burrows, 683. *Roach* v. *Edie*, 6 Term, 413.

pear what became of the goods, after they were landed at

*Embden*, or whether they ever reached *Hamburgh*.

The acceptance of the goods at *Embden*, is urged as con-
clusive against the plaintiff. A consignee is the agent of
the shipper, to receive his goods at the place of destination.
If he assumes to receive them in another place, he becomes
the agent of all parties. To render his acts binding on the
consignor, they should be voluntary. Here he had no voli-
tion, nor choice. The master could not go to *Hamburgh*,
and refused to deliver the goods at *Lubeck*, where the con-
signee wished to receive them. The master might have
put the goods on shore, so as to be entitled to freight. The
acceptance of them by the consignee's agent at *Embden*, was
compulsory, and *under protest*. He acted for the interest
of all parties ; he was bound to pay the freight, take the
goods, and dispose of them in the best manner, for the bene-
fit of all concerned. The discharge of the bills of lading was
a usual and necessary act, on the delivery of the goods. Af-
ter the abandonment, the property was at the risk of the
insurers, and it is incumbent on them to show what became
of it, after its delivery at *Embden*. Under all these cir-
cumstances, the plaintiff had a right to say to the defendants :
" You undertook that my goods should arrive at *Hamburgh*.
They have been prevented, by one of the perils mentioned in
the policy, from arriving at that port. I have lost the mar-
ket and the object of my voyage, and you must now indem-
nify me for that loss."

In answer to the objection, of the want of the preliminary
proofs, in regard to the proportion of general average, settled
at *Embden*, it may be said, that by refusing to accept the
abandonment, the insurers waived these proofs, and put the
party to his right. Those proofs, in fact, are not necessary,
where the party claims on the count for money paid to the
use of the defendants.

[*Court.* Can you recover for a total loss and an average
loss at the same time ?]

The insured may recover for a total loss, and for expen-
ses, as money paid and expended for the benefit of the in-

surers. The expenses or average, is then a matter incidental and collateral to the right of recovery for a total loss. The adjustment of the average was a proper object for the commercial tribunal at *Embden;* and having been decided by proper and competent authority, it ought to be conclusive here. The amount is insignificant, but it is important to determine the question how far the adjustment of a general average, by a competent tribunal in a foreign country, is to be binding on the parties here.

*Harison* in reply. The law of blockade has been often discussed in this court,* and is now too well settled to be disturbed. The doctrine is, that there must be an actual existing blockade, and that the neutral is not to be governed by a mere notification, or a blockade in contemplation of law, but may proceed to the port, and may enter, if no blockade *in fact* exist. The contract of insurance is to be made, and construed, according to this doctrine; the insured undertake to prosecute the voyage described in the policy, until prevented by superior power. If without such restraint, he should deviate, the insurer would not be liable for a subsequent loss. The insured is not to rest satisfied with any information he may chance to receive on his way, or any rumour which may reach him, as to a blockade; he is bound to pursue his voyage until he has ascertained, beyond all doubt or question, that an actual blockade exists. If the court have been liberal in the construction of the law of nations on this subject, they ought to require of the assured a strict adherence to this rule, before he deviates from his course. In this case, the master of the *Orozimbo* was merely told by cruisers of one of the belligerents, some hundreds of miles from the port of destination, that it was blockaded. He might have gone on, and by the time he arrived off the port, the blockade might either have been raised, or the blockading squadron be blown off by the winds. The notification he received was from an inferior officer, not from the government; from a person who might wish to deceive, and turn him away from his intended port.

But it is said, the blockade was a fact of public notoriety, and must, therefore, be presumed to have existed; if so, no other evidence would be necessary. But have not this court required evidence on oath of the existence of a blockade?* Here, a merchant of *New-York*, receives a letter from *Hamburgh* mentioning the blockade, and a vague rumour of the fact ensues; but who is to vouch for the veracity, or accuracy of the writer of that letter? The least that could be allowed, would be the deposition of a witness as to the letter received. The master was merely warned not to enter *Hamburgh;* he was not prevented from going to *Bremen* or to *Lubeck*, or any other place in the vicinity of the port of destination, in order to ascertain the fact of an existing blockade. Without pretending that he ought to have attempted to pass the blockading squadron, he ought certainly to have proceeded as far, and as near the port, as he could with safety. If he is to be governed by the information given him, by a *British* cruiser in the channel, he might as well have acted from intelligence received at the *Western Isles*, or in the *Atlantic Ocean.*

Can it be admitted, that the assured may, in such a case, on mere information of a blockade, turn aside and break up the voyage? Is this that *vis major*, that *superior power*, that coercion and restraint, which is said to constitute a peril within the policy? Is this a *restraint of Princes?* Though the doctrine about blockade has existed above a century, yet it has never been mentioned as an event included under the *restraint of princes.* But a prohibition to trade, is not a loss within the meaning of the policy. It is a mere excuse for a deviation, and the party is to go to the nearest port, and not break up the voyage.

Suppose there was a blockade in fact. This does not justify his going to *Portsmouth* or *London;* he ought to have proceeded directly to *Lubeck* or *Embden.* If he were allowed to go out of his way to seek advice, every deviation might be excused, on this easy and specious

NEW-YORK, May, 1806.

Schmidt
v.
United Insur. Company.

* *Williams* v. *Smith*, 2 *Caines*, 11.

pretence. The master staid 8 or 10 days in England. How far this was necessary does not appear; If it were one day beyond the necessary time, it amounted to a deviation.

The consignee was not bound to receive the goods at *Embden*; but having accepted them there, it is conclusive against the insured. The consignee had the bills of lading, he had full power to dispose of the property, and to act as he thought best for the consignor, he is emphatically, the agent of the consignor, and his acts are binding on him. If the goods were meant to be abandoned, they ought to have been left with the master, who is the proper agent of all parties.

The claim for general average is still more extraordinary. The plaintiff has paid nothing. There is no evidence that he laid out any money. If any thing was paid, it must have been by the master, who no doubt reimbursed himself out of the proceeds of the cargo at *Embden*. But the loss was occasioned by an accident to the ship, and ought to be borne by the owners of the ship. It was not a proper subject of general average; and this court is not to be governed by the decision of the merchants, or courts of foreign countries, without any investigation into the merits.

SPENCER, J. Without repeating the facts, I shall proceed to the consideration of the important question in the cause, whether the cargo has been lost, (even if *Hamburgh* was blockaded, and in a state that the vessel could not legally enter,) by any of the perils insured against in the policy. The words in the policy, under which the plaintiff claims for a total loss, are *arrests, restraints,* and *detainments of all kings, &c.* The terms do not I think, embrace a case like the present; for the master of the *Orozimbo* never attempted to enter the port of *Hamburgh*, nor was there any actual or immediate restraint, to hinder him from doing so.

I do not profess to consider, whether he was, or was not justified in going to *Embden*; but I rest on the fact that

there has been no *force* or *vis major* to interrupt his voyage. The case of *Pole* v. *Fitzgerald*,* is of high authority; and it is decided by that case, that the insurance is not on the voyage, but on the ship for the voyage. That principle appears to me to be applicable to this case; for here the ship and cargo remain in safety; but the assured has lost the chance of going to so good a market. The assurer has nothing to do with the speculation, nor state of the market; and nothing has intervened, affecting the ship or cargo, within the terms of the policy. The principle I advance, appears to be sanctioned by a decision in 3 *Bos. & Pul.* 392.† Though that case be not an authority, yet the reasoning urged by Ld. *Alvanley* is so just and conclusive, that I adopt it. The question, there, was, whether on an insurance from *Mounts-Bay* to *Naples*, when, subsequently, *Britsih* vessels were excluded from the *Neapolitan* dominions, in consequence of which the cargo insured, from its perishable nature, was obliged to be sold at an intervening port, there was a loss within the policy. The question did not turn on the consideration of the articles being perishable, a circumstance that afforded a just ground for selling them; but on this, whether the shutting the port of *Naples*, so that the vessel could not enter with the goods insured, afforded a ground of action on the policy.

To shew that this was the real point, the learned Judge says, " here without entering into the question how far the cargo was totally lost, the claim made by the assured arises from the ship's not proceeding to that port to which she was destined;" and this, he says, " cannot create a total loss within the meaning of the policy, because, it does not arise from a peril insured against; such peril must act directly, and not collaterally, upon the thing insured." It is not requisite to pursue this subject further. To what lengths might not the claims of the assured extend, if this was sanctioned? The parties have stipulated mutual things; the underwriters, against the perils of the sea, and any positive, actual injury from restraints, arrests, and detainments, &c. as matters *of fact*, and not of imagination.

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

* *Willes*, 644.

† *Hadkinson*
v.
*Robinson*.

*The* plaintiff's counsel have said, that an embargo is within the policy, and have asked why is not a blockade? The answer is obvious, an embargo operates directly on the subject insured, and this does not.

It becomes unnecessary to examine the question as to the want of preliminary proof of the average loss; on the first ground, I am fully of opinion that the defendants are entitled to a new trial, and that the costs should abide the event of the suit.

TOMPKINS, J. was of the same opinion.

THOMPSON J. The first question, presented by this case, is, whether a loss of the voyage, by reason that the port of destination was blockaded, be a peril within the policy; and if so, whether the evidence of *Hamburgh's* being blockaded was sufficient?

The insurance was on 35 bales of cotton on board the ship *Orozimbo*, at and from *New-York* to *Hamburgh*.—

This was not an illicit trade, and the assured, according to the general laws of trade, had a right to make his calculations for a sale of the shipment at the port of destination, and, for this purpose, insures the arrival of his goods at that port.   Our policies are extremely broad and comprehensive, and would seem to embrace every species of risk to which ships and goods are exposed, from the perils of sea voyages.   The underwriter, by his contract, stipulates, that the goods shall not be prevented from arriving at their place of destination, by any of the perils insured against.   One of those perils is the restraint of princes.   In the present case there was, I think, a total failure and loss of the voyage, by a peril coming within the meaning of the policy, under the term, restraint of princes. By the blockade, the vessel was prevented from going to her port of destinaton, and if she had proceeded she would have rendered herself liable to capture and condemnation; for the master to have proceeded to *Hamburgh*, when it was in fact blockaded, would have been a violation of his duty. The evidence offered, with respect to *Hamburgh's* being blockaded was, I think, competent, and proper to be

ᴜbmitted to the jury. So far as the protest of the mas-
ter went, it was the best possible evidence, and tended
directly to show an actual existing blockade ; and the ge-
neral understanding in *New-York* on the subject, was cer-
tainly a corroborating circumstance. These were submit-
ted to the jury as the testimony from which they were to
determine whether *Hamburgh* was in fact blockaded. If
a blockade be a risk within the policy, and *Hamburgh*
was in fact blockaded, the assured was not bound to
accept the cargo at any other place ; and unless there has
been some acts on his part that will amount to an accept-
ance, he is intitled to recover from the underwriters for a
total loss. The voyage being thus broken up, it was the
duty of the master to do what, under the circumstances of
the case, was best and most advantageous for the interest
of the concerned. His object in going to *Spithead* was to
obtain advice from the agent of his owners. And, it was
by his advice that he went to *Embden*, as being the safest
and nearest port to *Hamburgh*. The cargo, it is true, was
accepted by the consignee at *Embden*; but this I consider
not within the scope of their authority, so as to be binding
upon the assured. The consignee in this transaction
must be considered as a mere volunteer, and acting for the
benefit of whomsoever it might concern. Perhaps, howe-
ver, the acceptance ought not to be deemed a voluntary act
on his part, for he urged, that the goods might be sent
to *Lubeck*, which was absolutely refused, by the master and
owner of the ship. Nothing appears to show that the pro-
ceeds of the cargo have come into the hands of the assu-
red, or that he has done any act whatever, ratifying the
conduct of the consignees. I, therefore, see nothing to
preclude him from a recovery as for a total loss—the
sum allowed as a general average must be rejected.

LIVINGSTON, J. The effect of an interruption by block-
ade, that is, whether it be a peril insured against, is the first
point in this cause.

Without having recourse to the sweeping clause of " all
other perils, losses, and misfortunes," (which by *Molloy*

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

and some others, is supposed to " insure against heaven and earth, and to embrace every detriment that can possibly happen to the thing insured,") it appears to fall within the risk of restraints of princes, or of " men of war." It is by the latter that a blockade is formed, and if they prevent the safe arrival of the vessel, or turn her away, how can it be said that the voyage has not been defeated by a hazard insured against? It is not like a denial of entry, for that happens after arrival, and if accompanied with no restraint or detention, cannot amount to a loss; unless the assurer be considered, in all cases, as warranting a right to sell the cargo, whatever may be the laws of the country to which the property is sent.

But it is insisted that the *Orozimbo* had a right to proceed, and should have gone on, until she met with the investing squadron, and had been turned away. That *American* vessels, under the treaty of *London*, have the right of proceeding, until turned away in this manner, I never doubted, and such has been the decision of the court for the correction of errors, but this is not the only inquiry here. Properly to estimate the risk of proceeding, after the indorsement which was made on her register, we must look at the construction which the high court of admiralty of *Great-Britain* has put on this part of the treaty.

\* *1 Rob. Adm. Rep.* 154.

The *Columbia*,\* a case well known in this court, was captured without any previous warning, and condemned by Sir *William Scott*, because, the blockade of *Amsterdam* was known in *New-York* at the time of her sailing. On ground, then, somewhat resembling this, if not stronger, might the *Orozimbo* have been condemned, if she had gone on, after receiving advice of the blockade from two ships of war, both at no great distance from *Hamburgh*, though not of the blockading squadron. It is sufficient to justify the master's conduct, cases of this kind, if he have good reason to apprehend that in capture will be the consequence of going on. " A just fear,"

† *Cap.* 59, 291.

says *Targa*,† " is a kind of violence, so that abandonment " of a vessel from a *doubt* of not being able to resist, and " especially of being made a slave, is a loss within the policy."

And *Casaregis,*§ after observing that in such case, "a cap- NEW-YORK, May, 1806.
"tain should not rashly forsake his ship, adds, that it is
"otherwise, if the circumstances are such, as may excuse Schmidt v. United Insur. Company.
"fear, credulity, or even an error of the captain."—
"*Secus si talibus circumstantiis, quæ timorem, credulitatem,*
"*aut errorem capitanei excusare possent.*" *Emerigon,*‖ § *Disc.* 23, *N.* 84. ‖ 1 *Vol.* 509.
also, mentions several instances in which fear of a ship-
wreck, an enemy, pirates, or the like, which appeared
just at the time, though not in fact well founded, have jus-
tified a dereliction of the property. These principles, which
appear reasonable, apply to the *Orozimbo*, if we once admit
that capture is a peril insured against. If the master, from
the notification he received, and the advice given him, were
really afraid of condemnation, if he attempted to enter the *Elbe*,
(and such were certainly his apprehensions, nor were they
without foundation,) he was not bound to proceed. If he
had proceeded, and a loss had ensued, he would have been
censured, and have furnished a better ground of defence than
is now taken. I am presuming the port of destination to be
actually blockaded, which sufficiently appears to have been
the case with *Hamburgh ;* for all the parties, on or near the
spot, act on that supposition.

But if it were proper in the master to change his route,
he ought, it is said, to have gone to the next nearest port,
the voyage not being thereby lost, and the insurance
would have protected him thus far. This is not so ; the
moment a voyage is interrupted by a blockade, a right to
abandon exists, and if it be seasonably followed up, every
thing that is afterwards done, in good faith, by the master,
must be on account of the underwriters. The assured
are not obliged to receive their goods at the next near-
est port, or at any other port than the one to which the
vessel was bound. They have calculated on a particular
market, and if impeded in getting thither, a loss of the
voyage has happened, and the property may be cast on
the insurers. As to the captain, he acted for the best ;
nor ought a receipt of the cargo by the consignees to pre-
judice any one. This was an act, in which the ultimate

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

†3 *Bos. & Pull.*
389.

owner, whoever he might be, had an interest, and it should not be turned to the disadvantage of parties at a distance, who could not give any new orders respecting it. The only point determined in *Hadkinson* v. *Robinson*† is, that if a perishable cargo be sold at a loss, at an interme- diate port, in consequence of advice received during the voyage, of the port of destination being shut by the government of the country, it is not a total loss within the policy. This decision must have proceeded on the ground, that an insurance does not guaranty a right of entry, or to trade ; but if *Naples* had been blockaded, the court of common pleas, without violating any principle it adopted in this case, might have come to a different conclusion.

My opinion is, that the verdict is right, except as to the sum included in it, for the average loss, settled at *Hamburgh.* As this must already have been paid by the consignee out of the proceeds of the goods, that is, out of a fund belonging to the defendants, it ought not to be recovered in this suit ; the plaintiff, therefore, must deduct 57 dollars and 60 cents from his verdict, and enter judgment for the balance.

KENT, C. J. The first question that arises in this case, is as to the sufficiency of the evidence of the actual blockade of *Hamburgh*, in *August* and *September* 1803. This testimony consisted, 1. In the notice of the fact given to the captain, by an officer of one of the *British* ships of war, after the vessel had arrived on soundings near the *English* channel, with a prohibition to proceed there ; 2. In the like notice and prohibition given him, by an officer of another ship of war off the isle of *Wight ;* 3. In a letter written to him from *London*, on the 23d of *August* 1803, by *Thomas Wilson*, agent of the owner of the ship, who stated to him the fact, and advised him to go to *Embden ;* 4. In a letter from *William Boyd*, the owner of the ship, dated at *Hamburgh*, the 3d *September* 1803, and addressed to the captain at *Embden*, in which the fact seems to be necessarily implied ; 5. In the testimony of

a witness at *New-York*, who stated that he received information from *Bremen*, that *Hamburgh* was blockaded in the fall of 1803, and he supposed it was so generally understood and known at *New-York*.

This evidence was, in the first instance, sufficient for the jury to infer the existence of the blockade at the period in question, and as the defendants did not attempt to meet or destroy it by counter testimony, the verdict ought not now to be questioned, on account of the insufficiency of that evidence.

The next, and more important question, is, whether a blockade of the port of destination, be a peril within the policy. The only case in the *English* books that appears to have a bearing on the question, is that of *Hadkinson* v. *Robinson*.* The court there considered that the port of destination being shut, was a peril acting collaterally only, and not directly upon the subject. But that case arose upon the special memorandum in the policy, which requires a peril operating to the total destruction of the article insured. It is not an authority beyond a question arising upon *that* memorandum, for with respect to the loss of the voyage, by reason of a blockade of the port of discharge, the peril operates as directly as any other restraint or detention. The interdiction of commerce with the port of destination, is stated by *Emerigon*, *(Vol.* 1. 542.) to be a peril of the sea, and if it happens after the risk commences, (as we are to intend it did in the present case,) the insurer is responsible for the consequences of it; but if it existed before the commencement of the voyage, the contract is dissolved. In a question upon which the *English* books and decisions are silent, and when the opinion of *Emerigon* is founded, not upon local ordinances, but upon general principles of insurance, I cannot but consider him as a great authority. Nor do I see why a blockade should not be deemed equivalent to any other restraint or detention. It answers the description of a peril as understood in a policy, and which

* 3 *Bos. & Puller*, 389.

NEW-YORK,
May, 1806.

Schmidt
v.
United Insur.
Company.

includes every peril arising from a *vis major*, which could not be resisted, or from a *cas fortuit*, which human prudence could not foresee. It equally interrupts and destroys the voyage. Liberty to go to another port is changing the mercantile adventure, and is nothing less than the compulsory institution of a new voyage ; for if the *termini* of the voyage are changed, the identity of the voyage is lost.

I do not consider the act of the consignee in receiving the goods at *Embden* as binding upon the plaintiff; for as he received them there in consequence of the peril, it was an act of necessity, and he received them as agent for the party in whom the interest should vest, according to the course of events.

It appears, then, to me, that the blockade in fact being established, the captain was forced out of his voyage by the peril ; that his conduct in going to *England*, and from thence to *Embden*, arose from necessity, and was guided by the best advice, and the best discretion, that the circumstances of his case afforded ; and the abandonment having been duly made, the plaintiff is entitled to recover as for a total loss.

As to the further sum, found by the verdict, for the gross average, it cannot be admitted. We have allowed, after a recovery for a total loss, a further sum for expenditures in labouring to save the property, under the special agreement in the policy, but we have gone no further.— That sum must be deducted from the verdict.

Judgment for the plaintiff.