**1813.**

*Philadelphia,*
*Monday,*
July 12.

## Ferguson and another *against* The Phœnix Insurance Company.

Goods were insured on board the ship *Logan* "at and "from *New* "*York* to *Amsterdam,* with "liberty, in case "of being "turned off on "account "of blockade, "to proceed *to* "a neighbouring "*port.*" On the voyage she was boarded by a *British* privateer, and her papers endorsed "warned not to "enter or attempt to enter "an enemy's "port;" in consequence of which she proceeded to *Cowes,* where she arrived the 28th of December 1807. She there paid duties, and took a license for *Amsterdam,* to continue in force four months from the 30th of *December* 1807. On the 13th of *February* 1808, when about to depart, she was detained by a *British* ship of war, and libelled in the admiralty. Restitution was obtained on the 23d of *March,* and on the 18th of *April* she sailed with a view of prosecuting her voyage to *Amsterdam,* but was again captured by a *British* cruizer on the 3d of *May,* sent to *Yarmouth Roads,* and a second time libelled. She was restored on the 21st of *June;* but her licence having expired, and intelligence having been received in *England* that the *French* and *Dutch* decrees were rigidly enforced on the continent, the captain proceeded to *London,* and there discharged his cargo.

*Held,* that *London* was a *neighbouring port,* within the policy, and that the assured had no right to abandon.

THIS was an action of covenant upon a policy for 3200 dollars, dated the 2d of *November* 1807, on goods by the ship *Logan, Myrick* master, at and from *New York* to *Amsterdam,* " with liberty, in case of being turned off on ac- " count of blockade, to proceed *to a neighbouring port.*" Premium ten per cent., to return two, in case of safe arrival.

At the trial of the cause before *Yeates* J. at a *Nisi Prius,* in *January* last, the plaintiffs, having opened their case to the jury entirely from written and printed documents, the defendants demurred; and on this demurrer it came now before the Court.

The material facts were these: The *Logan* sailed from *New York* upon the voyage insured, on the 31st of *October* 1807, having on board *Havanna* sugars belonging to the plaintiffs, to an amount equal to the sum in the policy. On the 25th of *December,* s · was boarded off *Scilly* by the *British* private ship of wa *Minerva,* and her papers indorsed, " warned not to enter, or attempt to enter, an enemy's port." The captain of the privateer at the same time read to the captain of the *Logan,* the *British* orders in council; in consequence of which the latter proceeded for advice to *England,* and arrived at *Cowes* on the 28th of *December.* Finding from the *English* newspapers, that all neutral ships and cargoes coming from *England,* were liable to confiscation by the *French* decrees, he went to *London;* but learning nothing more than the existence of the decrees, he returned to his ship at *Cowes,* to remain there for information from *Holland,* which was daily expected, as to the operation of those decrees in that country. On the 22d of *January* 1808, he received advice from his owners' correspondents, that there

was no obstruction to *American* ships entering *Holland;* and having previously paid duties, and taken a license for *Amsterdam*, to continue in force for four months from the 30th of *December* 1807, he determined to proceed on his voyage to *Amsterdam*. But, as he stated in one of his protests, *after waiting at Cowes for a favourable opportunity to proceed with his ship for Amsterdam*, and being about to depart, he was, on the 13th of *February*, seized by an officer and boat's crew from the *British* ship of war *Pelter*, and the ship's papers taken and sent to *Portsmouth*. The ship and cargo were libelled in the admiralty, and the captain attended in *London* until the 23d of *March*, when they were restored. He then proceeded to *Portsmouth*, where the ship had in the mean time been carried, and obtained possession on the 1st of *April*. Bad weather and various accidents detained him until the 18th of *April*, when he weighed anchor, and proceeded to the *Mother Bank* to wait for convoy to the *Downs*. He obtained it on the 23d, and on the next day came to in *Dover Roads*, the wind being ahead. On the 1st of *May* he proceeded for *Amsterdam*, but on the third was boarded by the *Zenobia* sloop of war, and sent, under the charge of a prize master and crew, to *Yarmouth Roads*. The ship and cargo were a second time libelled in the admiralty, and restored on the 21st of *June;* but about this time, information being received that the decrees of the *French* and *Dutch* governments, prohibiting the entry into their ports, of any vessel coming from *England*, were rigorously enforced in *Holland*,—that several vessels had been seized there, and others ordered away, he determined to take his ship to *London*, and land her cargo, which he accordingly did a few days afterwards. On the 19th of *October*, the plaintiffs received a letter from *Gruffle* and brother, their agents in *London*, dated the 8th of *September*, informing of the unlading of the cargo, and on the next day they abandoned.

The case was very ably argued by *Hallowell* and *Rawle* for the defendants, and by *Hare* and *Meredith* contra; but the Court having expressed no opinion upon the point that was particularly pressed by the counsel, it becomes unnecessary to give more than the heads of the argument on both sides.

1813.

FERGUSON
*v.*
PHOENIX
INS. COMPANY

The *defendant's counsel* objected to a recovery as for a total loss, which was the only point in dispute,

1. In consequence of the delay at *Cowes*, from the 22d of *January* to the 13th of *February*, without any cause being assigned. This, they said, was a deviation which discharged the underwriters. *Park* 295. 310., 1 *Condy's Marsh.* 199, 200.

2. Because, after the expiration of her license, to wit, on the first of *May* 1808, the ship sailed for *Amsterdam*, a blockaded port, contrary to her duty to the belligerent who imposed it, and in violation of the policy, as she had been previously turned off. This was an increase of the risk, which discharged the underwriters.

3. Because, having been turned off from *Amsterdam* in consequence of blockade, the clause in the policy came into effect, by which it was made her duty to go to a neighbouring port; and *London* being selected as a port of discharge, was a neighbouring port, within the policy, where the voyage regularly terminated. If not a neighbouring port, then it was a deviation to go there; and none of the *French* or *Dutch* decrees, or *British* orders, justified the captain in thus deviating and breaking up the voyage. It was the consequence of apprehension merely. On this point were cited, *Richardson* v. *Maine Ins. Co.* (*a*), *Radcliff* v. *The United Insurance Company* (*b*), *Snowden* v. *Phœnix Insurance Company* (*c*), *Savage* v. *Pleasants* (*d*) *Lee* v. *Gray* (*e*), *Hadkinson* v. *Robinson* (*f*), *Lubbock* v. *Rowcroft* (*g*), *Blackenhagen* v. *London Assurance Company* (*h*).

4. Because the abandonment on the 19th of *October* was too late, the unlading of the cargo having taken place about the beginning of *July;* and the plaintiffs were responsible as much for the delay of their agents, in not sooner communicating that fact to them, as they would have been for their own delay in not communicating it immediately to the underwriters. Unless an abandonment is accepted, the agency is at the risk of the assured.

The *plaintiffs' counsel* answered

1. That there was no deviation by delay at *Cowes*, because the master swore that he waited for a *favourable opportunity*

| | | |
|---|---|---|
| (*a*) 6 *Mass.* 110. | (*c*) 3 *Binn.* 466. | (*f*) 3 *Bos. & Pul.* 388. |
| (*b*) 7 *Johns.* 38. 45. | (*d*) *Supra p.* 408 | (*g*) 5 *Esp.* 50. |
| 9 *Johns.* 277. | (*e*) 7 *Mass.* 349. | (*h*) 1 *Campb.* 454. |

*to proceed*, from which the jury might have inferred, and the Court must infer, that he seized the first favourable opportunity, and that unfavourable occurrences operating on the ship, such as the state of the winds or weather, prevented him from proceeding sooner.

2. That the ship sailed from *Cowes* for *Amsterdam* before her license expired, though taken afterwards; and that she was still under the protection of that license, in consequence of her previous detention being caused by the government that gave it. Nothing but this circumstance could have led to a restitution of ship and cargo, by the admiralty.

3. That *London* was not a *neighbouring* port within the policy; that phrase being used in a geographical sense, and with reference to the cargo, which was intended for a market on the continent. That if it was a neighbouring port, it was in the option of the plaintiffs not to use it, that clause being inserted, not to compel them to go there, but to protect them if they chose to go there, instead of breaking up the voyage and abandoning; and that the master, by reason of the ·*Dutch* decrees, and *British* orders, and the moral certainty of capture and confiscation in case he proceeded, was justified in breaking up the voyage, and landing the cargo in *England*. That this was the direct consequence of a legal and moral restraint, as effectual as if it had been actual, which was insured against by the policy, and entitled the plaintiffs to abandon. *Tenet* v. *Phœnix Insurance Company* (*a*), 1 *Emerigon* 507, 508. 510, 511. 543, 544., 1 *Valin lib.* 3. *tit.* 3. *Art.* 15. *p.* 656, 657., *Pothier, Charte Partie* 79., *Schmidt* v. *United Insurance Company* (*b*), *Craig* v. *United Insurance Company* (*c*), *Marine Insurance Company* v. *Tucker* (*d*), *King* v. *Delaware Insurance Company* (*e*), *Barker* v. *Blakes* (*f*), *Snowden* v. *Phœnix Insurance Company* (*g*).

4. That the abandonment was made in due time, being offered as soon as the plaintiffs knew of the loss; and that the negligence of agents abroad, did not affect the assured, because, by abandoning as soon as the loss was known, they transferred the property to the underwriters from the time of the loss, and placed the agency at their risk. Whether the persons having charge of property after a loss, are the agents

(*a*) 7 *Johns*. 363.     (*d*) 3 *Cranch* 396.     (*g*) 3 *Binn.* 469.
(*b*) 1 *Johns*. 249.     (*e*) 6 *Cranch* 71.
(*c*) 6 *Johns*. 226.     (*f*) 9 *East* 283.

1813.

FERGUSON
*v.*
PHOENIX
INS. COMPANY

of the assured, or the underwriters, depends on the former abandoning or not when the loss is known. If an abandonment is made, they are the agents of the underwriters.

TILGHMAN C. J. after stating the facts, delivered his opinion as follows:

Serious objections have been made to the captain's conduct in remaining so long at *Cowes*, after he had obtained a license to proceed to *Amsterdam*, and also to the conduct of the plaintiffs' agents in *London*, in suffering so long a time to elapse before information was given of the discharge of the cargo. I shall give no opinion on these objections, nor on the point raised by the plaintiffs' counsel, and very well argued, touching the general right to abandon, in consequence of the situation in which the ship was placed under the *British* orders in council, and the decrees of *France* and *Holland*. It appears to me, that the case may be more properly decided under the special agreement in the policy, by which the ship was permitted to proceed to a neighbouring port, in case of being turned off on account of blockade. This agreement is entitled to a liberal construction, having been intended to remove the embarrassments arising from a blockaded port. *A neighbouring port* is an expression not very definite. I see nothing in it, however, which is confined to a port on the *continent;* and it would surely be unreasonable to give it that construction, if a port in the island of *Great Britain* should be nearer than any port unblockaded on the continent. So with regard to a *blockade*, it is immaterial whether it be *actual* or *on paper*, lawful or unlawful. The decrees of the emperor of *France* blockaded the whole island of *Great Britain*, and the *British* orders in council blockaded all that part of the continent held by *France* or her allies. In such a case what was to be done? It has not been denied, that the port of *London* was nearer to *Amsterdam* than any port on the continent, not blockaded by the *British* orders in council. *London* then, may be fairly said to be a *neighbouring port*, within the meaning of the policy, and had the ship been lost on her way to that port, the underwriters would have been responsible. The captain had a right to go to *London*, and did go there for the purpose of discharging the cargo. Had the ship been lost on the way, the goods would have been covered by the policy. The owners of the

goods, then, shall not be permitted in the first place to avail themselves of the policy, in order to get their property into port, and having arrived there, to consider the voyage as broken up, and throw the cargo on the underwriters.

1813.

FERGUSON
v.
PHOENIX INS. COMPANY

Upon the whole of this case, it appears to me, that the voyage was completed according to the true intent of the policy. The assured, therefore, had no right to abandon.

YEATES J. was of the same opinion.

BRACKENRIDGE J. I continue to be of the opinion that I have heretofore expressed in other cases, that the indorsing papers, and ordering to proceed to a port in *England*, was a capture *sub modo;* that is according as the effect of it should turn out to be. It was such a restraint, and might occasion such detention, as to change the practicability of attaining a port of destination, and might break up the voyage. It did turn out to be the cause of an entry being prohibited at the port of destination, and of the voyage as to the main object being broken up; for I can have no idea that a port of *England*, was within the meaning of that clause in the policy, " with liberty, in case of being turned off on account of " blockade, to proceed to a neighbouring port." The nature of the cargo shews that it could not be a *British* port that was intended. Sugars, of which the cargo insured consisted, could not be discharged at a port in *England*, but for the purpose of transportation. A market there, or a sale for this purpose, could be no better, if not worse, from the duties to be paid, than at the port of departure. It was evidently a cargo for the continent, and a neighbouring must mean some port in the *vicinity* of *Amsterdam*, and upon the continent. It is apparent for another reason, that on the second of *November* 1807, the time the policy was underwritten, there was no *British* port blockaded, or could be blockaded actually; for no other belligerent power had the means of blockading actually, and the constructive blockade of the *Berlin* decree had been declared by the *French* government not to extend to vessels of the *United States*. And it was not until long after, viz. the 23d of *January* 1808, that even this constructive blockade, or prohibition of an entry, had been declared by the *Dutch* decree of *Lewis*, king of *Holland*. So that I do not consider the port of *London* finally attained, as coming within the meaning of the policy. It was

1813.

FERGUSON
*v.*
PHOENIX
INS. COMPANY

attained, it is true, and the cargo discharged; but this was compulsory, and the effect of the *British* outrage upon the law of nations, in marking papers, and ordering to proceed to a *British* port in the first instance. All that happened afterwards was a struggle to escape from the effect of this; the complying by proceeding to a *British* port. For without so doing, there was no chance, or at least so little as to render it improbable that the vessel could escape, in which case an absolute capture and condemnation was unavoidable. The *British* cruisers, covering every wave in the channel, and on the coast of *England*, she was as perfectly guarded as if a prize master had been put on board. I do not, therefore, consider the proceeding to *Cowes* as a deviation, but a necessity imposed as an act of prudence on the part of the captain, by reason of the indorsing papers, and warning to proceed to a *British* port. And under the denomination of necessary prudence, I include the paying duties, taking license or convoy. But the delay at *Cowes* is in my way, and may make it a deviation. For the delay of a day might materially vary the effect of the license which had been obtained, the chance of convoy, or a more or less rigorous enforcement of the *French* belligerent decrees. A delay of three weeks did materially vary. The license expired before approaching *Amsterdam*, which occasioned the taking by the *Zenobia*. But suppose a cause of abandonment to have arisen, would not the captain be considered as from thence the agent of the insurers, or the agent of both insurer and insured, so that as to the delay, it will equally affect both, and not the insured only, so as to discharge the cause of abandonment? There is an equivocal language of this kind to be found in tract writers, and the reports of judicial decisions, of the captain or agent entrusted with the ship and cargo, being the agent of both. But it is language or dictum, if any where found, which I cannot comprehend. I consider him or them the agent of the insured only, not after a cause of abandonment has arisen, and until abandonment made, but even after abandonment, and until reasonable time and opportunity be given to the insurers to get actual possession of the property abandoned, and to become his own agent. A want of due diligence, therefore, or a want of due prudence, and unskilful management on the part of the insurers, will defeat the right of abandonment. I have not an opportunity of looking

into authorities on this head, and comparing them, but it is so clear a principle in all cases of agency, that I cannot doubt of it. Now applying this, I am not able to get over the unaccounted for delay of three weeks at *Cowes*, and for that reason, and for that only, am constrained to concur in deciding for the defendants. It is possible the captain, had he been examined as to this, or had he attended to it himself, in the several protests that he made, could have filled up this place, by shewing some necessity for the delay; but he has not done it, though he had it in his own hand, and could easily have raised a storm, or given adverse winds, or wanted convoy, or have invented some accident, but he has not ventured to do this, and I can make no other inference, but that he was amusing himself on shore, and taken up with the pleasures of the place. This, though spoken of by the counsel for the defendant as a minor point, appears to me the major in this case. I think less of the great point made, that the *British* arrest and the *French* interdict did not come under the head of restraint of princes. For I take them together, and between one and the other, certain it is that the voyage was defeated and the object of it broken up; and if not with a view to a possibility of such war risks, why the ten per cent. premium? On the other principal point made, I am also clear, that a neighbouring port must be construed a port in the vicinity of *Amsterdam*, and on the same side of the channel or sea, which the port of *London* was not; and as to abandonment within reasonable time, it is unnecessary to say, as I am constrained to be of opinion that the unaccounted for delay at *Cowes* discharged the cause of abandonment which had arisen, or might afterwards arise.

Judgment for a general average only, to be adjusted by the parties.