Tilghman C. J.
This is an action on two policies of insurance on goods, shipped by the plaintiff in the ship Union, on a voyage from Philadelphia to Gottenburg and another port; warranted by the assured free from damage in consequence of seizure for illicit trade or seizure in port. The ship arrived with her cargo at Gottenburg, where permission to land the cargo was refused, in consequence of a decree of the king of Sweden, prohibiting the importation of colonial produce in neutral bottoms. At Gottenburg the captain received information of a similar decree of the king of Denmark, and therefore declined proceeding to Eckenforde as had *289 been originally intended, and went to Leith in the island of Great Britain. At Leith permission was given to land the whole cargo, in order to repair the ship, which had suffered damage on the voyage. Permission was also given to sell the cotton, but no other part of the cargo. The cotton was sold, and the ship returned with the rest of the cargo to Philadelphia. After her arrival at Philadelphia, the plaintiff abandoned, because permission had been refused to land the cargo at Gottenburg., or to sell any part of it, but the cotton, at Leith.
The declaration states a loss by seizure of the kings of Sweden and Denmark.
No actual seizure was made, but the plaintiff contends, that the decrees of Sweden and Denmark amounted to force, because the ship and cargo would have been liable to confiscation, had the captain attempted to act in contravention of these decrees. I shall give no opinion on the law, in case the captain had broken up the voyage and proceeded from Gottenburg to Philadelphia, because the facts exhibit a very different case. The plaintiff had a right to proceed to another port, after leaving Gottenburg, and although Eckenforde appears to have been the other port originally intended, .yet there was no obligation to go there. Gottenburg was very properly selected as the port at which the ship should touch for information, and according to the information received there, th'e captain might proceed to any other port. It is stated in the protest of the captain, that he determined to return to Philadelphia, but was obliged from necessity, to touch at some neighbouring port for repairs, and therefore went first to Leith. But we must judge not so much from his words as his actions. The ship arrived at Leith the 11th of January, and although the supercargo expected to be ready to leave it by the 20th February, they remained at that port until the 5th April. It appears that other American vessels had gone from Gottenburg to Leith, with a view of trading, so that notwithstanding the regulations of the British government, hopes were entertained of being able to dispose of colonial produce at Leith; and the fact was, that cotton was permitted to be sold, in consequence of which upwards of one-third of the cargo of the Union was disposed of. The amount of the whole cargo was about 46,000 dollars, of which about 17,000 dollars was cotton. The supercargo, Mr. Rush, wrote to his owners from Leith, on the *290 30th January, 1811, and informed them how matters were situated. It was the general opinion there, that if the non'ntercoul’se laws of the United States wei-e again enforced, the price of c.otton would rise considerably, and in order to t„j,e a¿vantage of this circumstance it was his intention to .store the cotton. No part of it was brought back to Philadelphia, so that the whole must have been sold in Great Britain. Here there was a trading to a very large amount, and there is no evidence of any great expenses for repairs, so that the pretence of selling this cotton for the purpose of raising money for repairs .will not avail. The supercargo’s letter was received in Philadelphia, on the 1st April, yet no abandonment was made till 21st May, after the ship’s arrival at Philadelphia. This proves, that the voyage was not considered as broken up, for if it was, the abandonment should have been made immediately. But in answer to this it is said, that no part of the plaintiff’s goods were sold at Leith; he had no cotton, but coffee and ginger only. This answer is not satisfactory, for the persons who sold the cotton were the agents of the plaintiff, as well as of the other owners. It is very material too, in determining the object of the voyage to Leith, that the plaintiff assigns as one of his reasons for abandonment, that the cargo, except the cotton, was not permitted to be landed in that port, so that he himself considered it as a port at which it was wished to trade. Upon the whole then, the plaintiff cannot say, that the voyage was .broken up at Gottenburg, because he intended to trade at Leith, neither was it broken up so as to claim for a total loss at Leith; because there tyas an actual trading there to a large amount. I am therefore of opinion, that the plaintiff ought not to recover for a total loss.
Yeates J.
A distinction is taken in Schmidt v. United Insurance Company, 1 Johns. 263, between an interdiction of commerce with the port of destination, happening after the risk commenced, and where it arose before the voyage began. In the former instance the insurers are responsible for the consequences of the interdiction; but in the latter the contract of insurance is dissolved. This agrees with 1 Emerigon, 542. A majority of the judges held that a prohibition to trade with the destined port, by means of a blockade, was a peril within the policy, and going to another port after- *291 wards for the purpose of delivering the goods was considered, after the abandonment, as done for the benefit'of the insurers. Livingston J. in that case says, a blockade is not like a denial of entry, for that happens after arrival, and if accompanied with no restraint or detention, cannot amount to a loss, unless the assurer be considered in all cases as warranting a right to sell the cargo, whatever may be the laws of the country to which the property is sent. It was afterwardsheld in Craig v. United Insurance Company, 6 Johns. 252, that although the insured cannot abandon quia timet, in cases: where the danger is remote and contingent, yet an interdiction of commerce with the port of discharge, happening after the commencement of the risk, authorises the assured to dis-continue the voyage, and return at the risk of the insurer. 1 Emerigon, 544.
The voyage here was evidently projected on the unsettled-state of the political horizon in the north of Europe. We-know not with certainty when the Swedish decree was enacted, forbidding vessels with cargoes of colonial produce to be-admitted to entry in the Swedish ports. The defendants’ counsel, in their argument, have treated it as if it were cotemporaneous with the Danish decree of 8th September, 1810,, in which case it must have preceded the date of the policies above one month, which contained a warranty of the, goods being free from seizures in port. '
The ship and cargo -arrived in safety at the quarantine' ground near Gottenburg, on the 8th December, 1810, but permission was refused to enter the ship or discharge the cargo. The policies were on goods on board the ship Union, from Philadelphia to Gottenburg and another port. The vessel being bound to Eckenforde (a port in Holstein in Denmark) with orders to touch at Gottenburg, captain Barry hearing that the port of Eckenforde was also shut by the prohibitory Danish decree, sailed from Gottenburg on the 4th January, 1811, intending, as he swore in his last protest, to make the first port where he could refit the ship. She arrived at Leith, in Scotland, on the 10th of the same month, when a survey was had and the cargo unladen. When repaired in dock the cargo was reladed, which was not-permitted to remain on shore, except the cotton, which according to the protest was left to pay expenses. She afterwards sailed from Leith on the 4th April-, and arrived in this port on the 18th- May fol *292 lowing, with all her outward cargo except the cotton. On the 21st of the same month the abandonment was made to the Company, on the grounds of the ship’s having been refused admittance into the port of Gottenburg, and not being permitted to leave the whole of the cargo at Leith. Upon the SOth January, 1811, the supercargo of the ship writes to his owner from Leith, that they had arrived there in distress, in consequence whereof they had been permitted to discharge ; that he proposed to sell the cotton on board, and would reship the rest of the cargo. Cotton sold there at Is. 2d. sterling per pound, and would rise if non-intercourse was enforced by the United States. This letter was made known to the plaintiff, who exhibited it to the Company on the 4th April, 1811. The time of the abandonment is very material. It was not made until the 21st May, 1811, which was one month and seventeen days after the plaintiff knew the contents of this letter. The plaintiff must be supposed to have waited for new events in Great Britain, which would lead to a relaxation of the orders in council. It appeared by the outward manifest of the cargo shipped in this port on the 10th October, 1810, that the total value of the manifest was 46,019 dollars 41 cents, including the cotton which cost -16,900 dollars 16 cents, and consequently that the cost of the cotton surmounted one-third part of the whole cargo.
I avoid giving any opinion whether the principle adopted by a majority of the judges of the Supreme Court of New York, in Schmidt v. United Insurance Company, (1 Johns. 249.) in the case of the destined port being in a state of blockade, is applicable to such port where trade is forbidden to cargoes of a particular description (ib. 262), or whether the interdiction of commerce at Gottenburg in this instance, supposed to have taken place before the commencement of the voyage, did not absolve the insurers from responsibility, particularly where the goods were warranted by the policies to be free from seizure in port. Other cases are said to be before us, where these principles must be decided, and I would not willingly disparage the claims of either party.Independently thereof the case before us affords sufficient grounds for our decision. Both policies on their face were effected on goods on board the ship Union from Philadelphia to Gottenburg and another port. The vessel and goods arrived in safety at Gottenburg but were denied an entry at *293 that port. Besides the expressions of Livingston J. in the case first cited, we have decided in Morgan v. Insurance Company of North America, 4 Dall. 458, that when the vessel had reached the foreign port of destination, and the government of that port had refused permission to land the cargo after it had been tendered to the consignee, which had been brought back again, the assured on a policy for freight could neither recover for a total nor partial loss. See Suydam and Wyekoff v. Marine Insurance Company, 1 Johns. 190. I cannot agree that the voyage was broken up and the object of the parties defeated, on another ground. I am satisfied that Gottenburg was not contemplated by the plaintiff as a port of delivery. The invoice is of goods shipped on account and risk of the plaintiff, bound to Eckenforde, consigned to Messrs. C. N. Buck & Co. The bill of lading signed by captain Barry, is for ginger, sugar, and coffee to be delivered at Eckenforde to Messrs. C. N. Buck & Co. or their assigns.- And the protest of captain Barry taken at Philadelphia, expresses that he' sailed from Philadelphia on the 12th October, 1810, bound for Eckenforde, with orders to touch at Gottenburg. It therefore appears clearly by these different documents, that Gottenburg was not considered as the port of delivery, where the goods were to be landed; but merely as a port of information, in the critical state in which public events had thrown the commerce of Europe. Of this intention, information ought to have been given to the insurers as material facts, but it seems highly incongruous, that indemnity should be sought by the assured for a loss supposed to have been incurred by not being permitted to trade at a particular port which had never been in view.
It appears to me, that the arrival of the ship at Leith satisfied the expression, other port, in the policies. It is true, the captain in his second protest states, that in consequence of leak, and the state of the ship, he was obliged to go to Britain to repair, and in his last protest, that the cotton was left at Leith to pay the expenses of refitting. But the letter of the supercargo, already stated, puts the case on very different grounds. The letter of .abandonment also expresses that the vessel having arrived at Gottenburg, was refused admittance, and then proceeded to the port of Leith, but was not permitted to leave any of her cargo except some cotton, which was left to pay the expenses of repairs, which clearly implies that the *294 ship proceeded to Leith for the purposes of trade connected with repairs. From none of the exhibits in the cause can we suppose' that so large a quantity of cotton sold at Is. 2d. sterling per pound could be necessary for refitting the ship.
This part of the case appears more in favour of the underwriters than that of Ferguson et al. v. Phœnix Insurance Company, 5 Binn. 544, where on a policy on goods on board the Logan from New York to Amsterdam, with liberty in case of being turned off on account of blockade, to proceed to a neighbouring port; the vessel after being twice captured proceeded to London, and there discharged her cargo; it was held, that London was a neighbouring port, and the insured had no right to abandon.
, Upon the whole, under all the circumstances of the case as submitted to us, I am of opinion, that judgment be entered for the defendants.
Bkackenridge J. concurred.
Judgment for the defendants.