KING (BANK OF COLUMBIA v.). See Case No. 871.

KING (BANKS v.). See Case No. 960.

## Case No. 7,788.

### KING v. DELAWARE INS. CO.

[2 Wash. C. C. 300.][1]

Circuit Court, D. Pennsylvania. Oct. Term, 1808. [2]

MARINE INSURANCE — ABANDONING VOYAGE — WHEN JUSTIFIED — APPREHENSIONS OF DANGER —BLOCKADE—LIABILITY OF UNDERWRITERS—INCREASE OF RISK—PROVINCE OF COURT AND JURY — ABANDONMENT OF FREIGHT — STATEMENT OF REASONS.

1. Insurance was made on the freight of the Venus from Philadelphia to the Isle of France. On the voyage insured, the ship was stopped by a British ship of war, on the 16th of January, 1808, detained for a short time, and discharged, her register being endorsed "Warned not to proceed to any port in the possession of his majesty's enemies." The Venus returned to Philadelphia on the 23rd of February, 1808, and the assured claimed for a total loss. The Isle of France was not blockaded by an actual force, until after the 1st of February, 1808: but the captain of the British ship informed the master and owner of the Venus, that the Isle of France was blockaded, and that she would be prize, which caused the Venus to return to Philadelphia. Under what circumstances the master of a ship will be justified in abandoning his voyage, from apprehensions of danger.

2. The actual existence of a blockading force, and only reasonable doubt prevailing that there is danger from it, does not justify a deviation from a voyage insured.

3. If the underwriter is to be rendered liable for a technical total loss, where none has really been sustained, the insured ought to do all in his power to prevent such loss, and he should proceed upon his voyage until the danger of an actual loss is rendered manifest.

4. The Isle of France not being in fact blockaded, there was not a legal or actual force to prevent the Venus proceeding there.
[See note at end of case.]

5. Information of the place to which a vessel is proceeding, being surrounded by hostile privateers, will not authorize the captain breaking up his voyage, from an apprehension of danger, and thus make the underwriters liable.

6. An increase of risk after the voyage is begun, will not excuse the insured, beyond a prudent and necessary deviation in order to avoid it.

7. Warning and endorsement of papers, do not amount to "an arrest, restraint, or detention."

8. When the jury assume the right to draw conclusions, which are exclusively the province of the court, they will be disregarded.
[See note at end of case.]

9. The insurers on the freight of the Venus are not liable for the same, as the voyage was improperly broken up.
[Cited in brief in Bosley v. Chesapeake Ins. Co., 3 Gill & T. 462.]
[See note at end of case.]

10. The insured must always state to the underwriters a sufficient reason for his offer to abandon, and if he does so, it is no objection that he does not state other reasons.

11. If the assured states an insufficient reason for abandoning, he cannot, at the trial, rely upon one not stated in the notice.

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]
[2] [Affirmed in 6 Cranch (10 U. S.) 71.]

This was an action founded on a policy of insurance, dated the 5th of December, 1807, on the freight of the ship Venus, valued at eight thousand dollars, at and from Philadelphia to the Isle of France. The policy was in the usual form. The jury, at the last term, found a special verdict as follows: That the plaintiff chartered the ship Venus to L. D. Carpentier, on the 10th of November 1807, as per charter party. (The charter party is for a voyage from Philadelphia to the Isle of France, and thence back, at a freight of twelve thousand dollars, of which two thousand dollars were to be paid at the Isle of France, and the balance on her arrival at Philadelphia.) That the policy was effected by the plaintiff with the defendants, on the freight of the said ship, for the sum of six thousand dollars, as per policy, subject to the conditions therein mentioned. The said ship sailed forthwith, intending to prosecute her voyage to the Isle of France; and on the 16th of January, 1808, in the afternoon of that day, while sailing and proceeding on the voyage, she was stopped by the British ship of war, Wanderer, in latitude 24° 14' north longitude 8° 35' west, whose officers took out the papers and crew of the Venus, and placed her in the possession, and under the orders of an officer and eight men, in whose custody, and under whose direction she continued from the afternoon of the 16th, to the morning of the 18th of January, following the fleet of which the Wanderer was a part of the convoy. That on the 18th, the British seamen were withdrawn from the Venus, and her crew restored. That an officer of the Wanderer endorsed the certificate of ownership of the Venus, as well as her clearance, with the following words: "Ship Venus, warned off, the 18th of January, 1808, by his majesty's ship Wanderer, from proceeding to any port in possession of his majesty's enemies. Ed. Medley, Second Lieutenant." That the possession, by the British force, of the Venus, was not as prize, but merely with a view of preventing the Venus from prosecuting her voyage to the Isle of France. That by the interruption, detainment, and warning off by the British force, the voyage of the said ship Venus was broken up. That the Venus returned to the port of Philadelphia, on or about the 23d of February, 1808, and that her cargo has been restored to the respective shippers. She arrived in the Delaware on the 21st of February. That from the 5th or 6th of December, 1807, until the 1st of February, 1808, the Isle of France was not blockaded by any actual naval force. That the plaintiff, captain, and owner of the Venus, was verbally informed by an officer of the Wanderer not to proceed to the Isle of France, declaring that island to be blockaded, and that she would be a good prize if she proceeded thither. That, in consequence thereof, the said King was fully justified in returning to the port of Philadelphia. That on her arrival at Philadelphia, she was unable to renew the voyage, by reason of the embargo, laid on the 22d of December last. The vessel and cargo were American property, and chartered to an American citizen. That King is an American citizen, of New York. That the Venus had on board all the usual, regular, and necessary papers, and was sufficiently manned, found, fitted, and prepared for the voyage. The jury find the British orders of council, dated the 11th of November, 1807, as appears by the London Gazette, published by authority, November 16th, 1807; and also subsequent orders of the 25th of November following. If the law is for the plaintiff, they find for him five thousand eight hundred and eighty dollars; if otherwise, for the defendant.

The notice of abandonment stated, that the ship Venus, bound from Philadelphia to the Isle of France, having had her register endorsed, and warned by the British ship Wanderer from proceeding to her destination, has returned to this port, by which circumstance her voyage is broken up; therefore, the freight insured by the above policy, is abandoned to the defendants. Dated February 22d, 1808.

WASHINGTON, Circuit Justice. The only question in this cause is, whether the ground of abandonment, stated in the notice, be sufficient in law, to entitle the plaintiff to recover as for a total loss. This question must depend upon the fair construction of the contract, which these parties have entered into. The nature of the obligation which the underwriter assumes, is, that the vessel or cargo, as either may be insured, shall go in safety to the port of destination; or that the freight shall be earned, if the insurance be upon freight, notwithstanding any of the perils enumerated in the policy; and that, if in consequence of those perils, or either of them, a loss should happen, he, the underwriter, will indemnify the insured against such loss. If the property insured be actually lost, or the voyage be put an end to by any of the enumerated perils, in which case a technical total loss takes place at the option of the insured, he is at liberty to abandon all his interest to the underwriter, and to demand the stipulated indemnification. The question then will be, whether the blockade, declared by the British orders in council of the 11th and 25th of November, 1807, and the warning given to the Venus, in this case, amounted to a peril within the words "arrests, restraints, and detainments of princes," &c.; for it is not pretended, that any other peril mentioned in the policy, applies to the case. Was she arrested, restrained, or detained, except for the period employed in examining her papers, and from which she was soon relieved? It may be admitted, without difficulty, that a vessel may be restrained, as well by the operation of law, or by an irresistible prevention, from performing the voyage, as by the application of actual physical force. The vis major may be substantially the same in its effects in

either case, provided, that in the former, there exists in fact a right or a power to make the restraint effectual, and a reasonable degree of certainty that it will be and can be so used. An embargo is as much a restraint and detention, although it amounts to nothing more than a legal prohibition against the sailing of the vessel, as if she were taken into the custody of the officers of the government, and were deprived of all the means of removing from the wharf. A blockade formed by the actual investment of the port of destination, is a restraint imposed by the government to which the blockading squadron belongs, although the vessel is never for a moment arrested, and is left free to go wherever she pleases, except to the invested port. But in this case, the attempt to enter the interdicted port would be a violation of the law of nations, and would be followed, with almost absolute certainty, by the penalty of seizure and confiscation; and there exists, in fact, a power to make the seizure, and to enforce the penalty. In some cases, the apprehension of restraint has been considered as equivalent to a real restraint, although the danger was not immediate and certain; which, it must be admitted, is going a great way. But it is conceived, that, in such cases, the actual existence of a power to restrain must be shown, and no reasonable doubt should be felt, but that it would and could have been effectually exercised, in case an attempt had been made to enter the port of destination. If the underwriter is to answer for a technical total loss, where none has really been sustained, it is the duty of the insured to do all he may to prevent such loss; and he should proceed upon his voyage, until the danger of an actual loss is rendered manifest.

At the time the Venus was notified, by the commander of the Wanderer, of the blockade of the Isle of France, she had performed but a very small part of her long voyage. The Isle of France not being in fact blockaded, there was neither a legal nor an actual force to prevent this ship from entering the port of her destination; except the casual danger arising from capture by privateers, to which neutral vessels were exposed, by the injustice and rapacity of the belligerent powers. Of course, the situation of the Venus, in relation to the perils of arrest or detainment, was in no respect changed, from what it was when she left her port of departure. It is in vain to say that she might, after the endorsement of her papers, have met with British cruisers, in which case this evidence of her having been warned, would have subjected her to capture and condemnation; for this is merely stating an apprehended, instead of a real danger. If the captain of the Venus had, on his voyage, received information, and if such had been the fact, that innumerable privateers covered the seas over which she was yet to pass, this would have very much increased the probability of capture, but it would not have justified the insured in breaking up the voyage, and throwing the whole loss upon the underwriters. An increase of the risk, occurring after the voyage has begun, will not excuse the insured, beyond a prudent and necessary deviation, in order to avoid it; most unquestionably, it will not warrant the putting an end to the voyage altogether, as was done in the present case. Neilson v. Columbian Ins. Co., 1 Johns. 301, is a stronger case to justify a deviation than the present, because, though apprehension of danger was the cause of it in both, yet in that, the cause was present, in this it was contingent and remote. It is not necessary for the court to say, what course the Venus might or ought to have adopted after she was discharged by the Wanderer, or to attempt to lay down a general rule for the government of the assured in similar situations. The ground of our opinion is, that the reason assigned for the abandonment in this case, is not within any of the perils enumerated in the policy. The notification, warning, and endorsement of the papers, do not, under the circumstances of this case, amount to an arrest, restraint, or detainment. We totally disregard the conclusions of law, which the jury have drawn from the facts found, because they are not competent to draw such conclusions; and in the present instance, we conceive they have mistaken the law. It is true, that the voyage may have been broken up, in consequence of the circumstances stated by the jury; but in point of law, this was not a sufficient reason for the step which was taken. Nor can we agree with the jury in opinion, that the verbal communication made to Captain King by one of the officers of the British ship, or all the circumstances of the case taken together, justified the captain in returning to Philadelphia.

It is believed that this opinion is in collision with none of the cases which were cited in the argument, and is fully supported by the principles laid down in most of them. An examination of these cases is all which now remains. The case of Schmidt v. United Ins. Co., 1 Johns. 249, is certainly the strongest which was referred to on the side of the insured. Without giving any decided opinion upon that case, it will be sufficient to point out the circumstances which distinguish it from the present. In that, the voyage was from New-York to Hamburg. The vessel had progressed as far as the English channel, when she was regularly notified that the Elbe was blockaded, and the fact was, that the Elbe was actually invested. The vessel, however, proceeded to the nearest port to that of her destination. She was warned, comparatively speaking, in the very neighbourhood of the place where her voyage was to end, by a British ship of war; and it was highly improbable that she would find the blockade raised, had she persisted in prosecuting her voyage to Hamburg. The interdiction of trade with that port was legal; a force was on the spot to prevent and to

punish the attempt to violate it, and the event was considered as certain, if the vessel had persisted in going thither. Upon the main question the court was divided, but it seems to have been agreed by all the judges, that there must be evidence of a blockade in fact, and that a mere notification amounts to nothing. In this case, the Venus had probably not proceeded a tenth part of her voyage, no actual investment of the Isle of France existed, and the vessel returned home, leaving it as uncertain then, as at the time of her departure, whether she might suffer from any of the perils against which she was insured. Scott v. Libby, 2 Johns. 336, was the case of a vessel turned away from the port of her destination by an investing squadron, so that the owner was prevented, by actual vis major, from complying with his contract to carry the goods to that port; notwithstanding which, it was decided that he was not entitled to his freight. The cases of Hurtin v. Phoenix Ins. Co. [Case No. 6,-941], and Simonds v. Union Ins. Co. [Id. 12,-875], in this court, turned upon a breaking up of the voyage, in each case, by an actual force operating immediately on the subjects insured, and preventing its completion. In Morgan v. Insurance Co. of North America, 4 Dall. [4 U. S.] 455. the goods were carried to the port of delivery, and offered to the consignee, who could not receive them in consequence of an order of the government. The court decided that the freight was earned. Neilson v. Columbian Ins. Co. has been before noticed. It is an authority against the plaintiff, in whose behalf it was cited, for the reasons before mentioned.

These are all the cases which were cited in support of this action, so far as is recollected. It must be admitted, that the case of Hadkinson v. Robinson [3 Bos. & P. 388], referred to on the other side, was decided upon the special memorandum in the policy, although it did not necessarily turn upon that circumstance; and therefore, it is not to be relied upon as an authority, in a case unaffected by the memorandum. Dyson v. Rowcroft, which followed soon afterwards (3 Bos. & P. 474), furnishes a satisfactory commentary upon the expressions made use of by Lord Alvanley in the former case. This also was an insurance on articles excepted by a memorandum from losses not total in their nature. The articles were rendered so rotten by sea water, that it became necessary to throw them overboard. Here the peril which produced the total loss of the thing insured, acted directly upon it, and produced its destruction; whereas, in Hadkinson v. Robinson, the occlusion of the ports of Naples against British vessels, acted circuitously upon the subject insured, since it could not be positively said that this was the cause of its destruction. Nevertheless, there are a number of very strong expressions used by Lord Alvanley in this case, which would lead to a conclusion, that his judgment would

have been the same, if the policy had been upon goods not included within the memorandum; for if the embargo, under the circumstances of the case, was not such a peril as would justify breaking up the voyage, it would have been shorter to say so at once, and the ground of decision would have been more direct and intelligible, than that which was taken. But the case of Lubbock v. Rowcroft, 5 Esp. 50, is conceived to be directly in point, though infinitely stronger than the present, in favour of the insured. That was a policy on twenty bags of pepper, on a voyage at and from London to Naples, Leghorn, or Messina, with liberty to touch at any port in the Mediterranean. When the ship arrived at Minorca, it was found that Messina was in the hands of, or blockaded by the French, in consequence of which the insured abandoned and went for a total loss. Lord Ellenborough considered that the abandonment was made from an apprehension of capture, and not from a loss within the terms of the policy, and that if such was allowed, every ship about to sail from the port of London, to a port which had fallen into the hands of the enemy, might abandon. Erskine, for the insured, admitted, that though one hundred French privateers had covered the seas, so that the probability of capture was great, this would not have justified a breaking up of the voyage, because, notwithstanding the danger was so imminent, the vessel might have escaped; but he insisted, that in that case the capture was certain. This case appears to have been overlooked by the bar and bench, in the case of Schmidt v. United Ins. Co., or it might properly have shaken the opinion of some of the judges, if its authority was allowed. Without admitting that it is to be considered as such, it may safely be said, that if that decision be nearly right, the opinion of this court cannot be very wrong. The principle laid down by Lord Ellenborough, that an apprehension of capture does not afford a cause of abandonment, we entirely approve; whatever we might have thought as to its application to the circumstances of that case.

Without determining whether the delivery of the cargo to the freighter, after the return of the Venus to the port of Philadelphia, did or did not defeat the offer of abandonment, and without giving an opinion, in this case, upon the effect of the embargo, we think, that upon the point which has been discussed, the law is in favour of the defendants. Our reason for avoiding the last point is, that the embargo is not stated in the notice given to the defendants, as a ground of abandonment, and, consequently, it cannot be relied upon at the trial. It is incumbent on the insured to state to the underwriter a sufficient reason for the offer to abandon, and it is no objection, if he does so, that he does not state other reasons. But if he state an insufficient one, he cannot. at the trial. rely upon one not stated in the notice. This is

clear, from the nature and use of an abandonment. The underwriter should have an opportunity of judging whether he is bound to accept the offer or not. If bound, that he may do so at once, and by becoming the owner, may take proper measures for the preservation of the property. To conceal the true ground, is to deceive him into possible error, and materially to affect his interest. Judgment for defendants.

[NOTE. The plaintiff then took a writ of error to the supreme court, where the judgment was affirmed in an opinion by Mr. Chief Justice Marshall, who said that the finding of the jury that the voyage was broken up was not conclusive upon the court, as such a question was one of law. The British orders in council of November 11, 1807, did not prohibit a direct voyage from this country to a colony of France. The Isle of France was not blockaded, and the fears of the captain, founded on misrepresentation, were not sufficient cause for the breaking up of the voyage. As there was no legal impediment to the vessel proceeding, the indorsement on her papers would not have increased the danger. She might have proceeded, and ought to have done so until she could obtain further information. The court expressed no opinion on the question of how far the underwriters would have been liable had the orders of council prohibited the trade to the Isle of France. 6 Cranch (10 U. S.) 71.]